PATRICK MURRAY v. CHANDLER SMITH AND OTHERS.

No particular words are necessary to constitute a warranty. A representation or any positive affirmation of the state, quality, condition or fitness of the thing sold, which may be supposed to have entered into the consideration of the sale, showing an intention to warrant, and which was so understood and relied upon by the purchaser, will amount to a warranty.

Whether what passed between the parties, amounted to a warranty, or was merely a recommendation or an expression of opinion, is a matter for the determination of the jury, unless the language used has a fixed or technical meaning.

But where there is some confusion or misunderstanding between the parties as to whether the property was warranted as a certain thing, or of a certain quality, the understanding of the parties, on the intent, must be left to the jury, and they are to say as to whether there was a warranty of the goods as fit for a certain purpose, or as of a certain quality.

Where goods are sold to be used for a certain purpose, and they are found by the purchaser to be unfit for such purpose, he is not obliged to return them, but may have his remedy by an action for the breach of the warranty or recoup his damages in an action brought for the price.

All that is ordinarily implied by the exhibition of a sample is that it has been fairly taken from the bulk, but any representation that the bulk is equal to the sample may amount to an express warranty.

A broker having power to sell, may, unless he be specially restricted from doing so, sell with a warranty as to the quality of the article sold, or as to its fitness for a particular use.

Plaintiff sold to defendants by sample, certain barrels of lamp-black, with a warranty that all the lamp-black would come up to the sample shown, which had been taken from one barrel, and also with a warranty that the lamp-black was fit for making printers' ink. After the goods were delivered to defendants, they examined them and found that the barrels did not all come up to the sample, and plaintiff made a reduction in the price. Afterwards defendants discovered that the lamp-black was not fit for making printers' ink, and in a suit for the price set up a breach of warranty; *Held*, that although by agreeing to take the goods at the reduced price, defendants had waived their right to set up that the goods did not correspond with the sample, yet that they were not prevented from setting up the breach of the warranty that the lamp-black was fit for making printers' ink.

APPEAL by plaintiff from a judgment entered on the verdict of a jury.

Action for goods sold and delivered. Defense, a breach of warranty as to the quality of the goods sold, by which they were rendered totally useless to the defendants. Defendants had a verdict in their favor. The facts are stated in the opinion.

*R. L. Scott*, for appellant.

*G. A. Seixas*, for respondents.

BY THE COURT.*—DALY, CH. J.—This verdict cannot be disturbed. The judge told the jury that "where there is some confusion or misunderstanding between the parties as to whether the property was warranted as a certain thing, or of a certain quality, the undertaking of the parties, or the intent, must be left to the jury and that they are to say as to whether there was a warranty of the goods as fit for a certain purpose, or as of a certain quality." After this general observation he left it to the jury to say whether the lamp-black was warranted as fit to be used for printers' ink or not, and as they found for the defendant, we must assume, *in support of their verdict,*

---

that there was such a warranty. As there was conflicting testimony in the case, we must also assume, in support of the verdict, that the jury found the facts to be as stated by the defendants' witnesses, and upon this assumption, there was sufficient in the case, as presented by the defendants' witnesses, to entitle the judge to leave it to the jury to say whether there was a warranty or not. As a general rule, the finding of the jury upon the question whether there was or was not a warranty, will not be disturbed, even where there was no contradiction among the witnesses as to what occurred, if the point is at all doubtful or uncertain.

No particular words are necessary to constitute a warranty. A representation or any positive affirmation of the state, quality, condition or fitness of the thing sold, which may be supposed to have entered into the consideration of the sale, showing an intention to warrant, and which was so understood and relied upon by the purchaser, will amount to a warranty. This is of course distinguishable from a mere recommendation of the article, or the expression of an opinion respecting it, or the innumerable things that a vendor will say to enhance the value of his commodity and induce the sale of it, such as its cheapness, excellence, &c., for then the buyer understands that he must examine and judge for himself and not that he is buying upon an express undertaking upon the part of the seller that the article is of a certain kind, or fit for a certain use, and that he will be responsible for any loss or injury that may arise if it should not be. (See the cases collected in Hilliard on Sales, p. 341, 3d ed.) Whether what passed between the parties amounted to a warranty, or was merely a recommendation, or an expression of opinion, is a matter for the determination of the jury, unless the language used has a fixed or technical meaning. This has been repeatedly held (*Duffee* v. *Mason*, 8 Cow. 26; *Whitney* v. *Sutton*, 10 Wend. 413; *Blakeman* v. *Mackay*, 1 Hilt. 266; *Rogers* v. *Ackerman*, 22 Barb. 134), and it is especially for the jury, in cases like the present, where the point is doubtful or uncertain.

The plaintiff's agent, who is a broker, had sold the defendants some lamp-black, which proved to be very good. He came

again and told the defendants that he had another lot to sell which a party had, who represented it as better than the previous one. He said that the party had examined the sample, and that it was a superior lot to the one which had been sold to the defendant before, and that he thought that he could sell it at about the same price. The defendants told the broker that he must be very particular in having black that would make printers' ink, the defendants being manufacturers of printing ink; that black for carriage work would not answer; that he must have lamp-black for printing ink. The broker then said that he would bring a sample of it, and the defendants told him to bring a sample from every cask. He brought, however, but one sample, saying that *it was all the same*, and *would come up to that sample;* which, according to the testimony of the manufacturing chemist in the defendants' establishment, was good lamp-black, pure, and without any grit in it. The defendants asked if it was fine black for printers' ink, and the broker answered that the parties knew better than he did in respect to that, but it was recommended from them as black for making printers' ink. The defendant testified "He," the maker, "handed to me but one sample, and sold it, I believe, to me on that sample, *as being all the same.* He sold it to me to make printers' ink of ; that was the very purpose I bought it for. I told him so expressly, and agreed with him to pay fourteen cents a pound for that black, *according to that sample.*" It further appeared that the defendant said to the broker that he did not want any lamp-black at that time ; that he would not want to make it into ink for two months ; that the broker answered that the defendant might make some arrangement about the time, that he could have a bargain of it, and the sale was accordingly made upon two months' credit.

The broker testified that he did not guarantee it, that he was not asked to ; that he knew nothing of lamp-black, or whether it was good for any purpose or not ; that he knew the business that the defendant was in ; knew that the defendant wanted it for printers' ink, that that was implied of course ; that the defendant told him that he wanted it to make printers' ink of ; and that he sold it to him for that purpose. The fol-

lowing question was put to him : " You were authorized by the
plaintiff to give it to him for that purpose," and he replied that
when the plaintiff found that he had sold his lamp-black to
the defendant, the plaintiff said to him, sell mine ; that in the
transaction he was the plaintiff's broker ; that as he understood
it, it was a sale by sample, and was sold for *printers' ink as he
understood it.* He also testified that the plaintiff gave him
the sample of the lamp-black, and that he gave the sample to
the defendant to see if he could use it for ink.

All that is ordinarily implied by the exhibition of a sample
is that it has been fairly taken from the bulk, and in a sale
made simply by the exhibition of a sample, the vendor is not
responsible for latent defects. Having taken the sample fairly
from the bulk, the buyer is assumed to be as competent as the
seller to judge of the merits, quality or value of the article,
and if, under such circumstances, he buys simply upon the in-
spection of the sample, he takes the risk, and can make no re-
clamation thereafter upon the buyer. But in this case there
was something more. The defendant wanted a sample from
every cask, but the broker brought but one, declaring that it
was all the same ; that it would come up to that sample, and
the defendant, as he testified, bought it according to that sam-
ple, saying in addition that the broker, as he believed, sold it
to him on that sample, as *being all the same.* This places the
transaction in a very different aspect, for any representation or
express affirmation, as was said by Paige, J., in *Hargous* v.
*Stone,* 2 Seld. 85, that the bulk of the commodity sold is equal
in quality to the sample exhibited, or that the sample is a true
specimen of the bulk, presents the question of an express war-
ranty, and it is very plain upon the evidence, that there was a
warranty that the bulk of the commodity was equal to the
sample, which it certainly was not, the evidence upon that
point being clear and conclusive.

If this were all there was in the warranty, the verdict
could not be sustained, for the parties subsequently modified
the contract in this respect. A week or ten days after the de-
livery of the twenty-one barrels of lamp-black, a cursory ex-
amination of them was made by a person in the defendants'

employment, and it was found that they varied very much. This examination was made by boring a hole in each barrel and taking out some of the lamp-black from each, and it was found that the barrels were of different qualities, and that upon the whole, what was delivered did not come up to the sample.

This was represented to the plaintiff; a proposition was made to him by the defendant to make a reduction of four cents a pound upon seven of the barrels, to which he assented, and a new bill was made out in which this deduction was allowed. This must be regarded as an agreement to abrogate the warranty, that the bulk corresponded with the sample, in consideration of the reduction made in the price of the seven barrels; but it did not necessarily abrogate the additional warranty that the commodity sold would make printers' ink, or (as we must assume the jury found under the judge's charge) that it was fit for that purpose, if there were such a warranty.

This, upon the evidence, was much more doubtful. It is, perhaps, questionable whether what was said upon the subject amounted to anything more than the expression of an opinion. The broker said that the parties knew better than he did, and that it was recommended from them as black for making printers' ink; but when that is taken in connection with the defendant's statement to the broker, that he must be very particular in having black that would make printers' ink; that black for carriage work would be of no use; that he must have lamp-black for printing ink; that the broker knew that he was a manufacturer of printers' ink; that he told the broker that that was the very purpose for which he bought the lamp-black, and his statement that the broker sold it to him to make printers' ink of it, coupled with the broker's own statement that he sold it for printers' ink *as he understood it;* that the plaintiff was a dealer in the article, and was for twenty years a judge of lamp-black; that to open and examine the barrels thoroughly from bottom to top would have involved trouble and expense, and as the defendant did not want to use it for two months, would have injured it, as in such case it would accumulate matter; and finally, that there are qualities that cannot be ascertained by prior examination, or known,

until it is made with ink, and that the only sure way to ascertain the quality of this lot was to use it; when I say all this, which was in evidence, is considered, it involves a doubt whether there was or was not a warranty that it was fit for this purpose, so as to make the question one exclusively for the jury. "The words used," says Sutherland, J., in *Duffee* v. *Mason*, 8 Cow. 26, "may amount to a warranty or may be matter of opinion merely; and it is for the jury to determine from all the circumstances of the case, *how they were understood and intended by the parties*. \* \* \* The understanding of the parties to a contract of this nature, where the language used by them has no fixed or technical meaning, is a matter for the determination of the jury," and the present case is a good illustration of the propriety of the rule there laid down and followed in the subsequent cases that have been quoted.

The jury have found that there was such a warranty, and this conclusion on their part is final, and cannot be reviewed. When the agreement was made to deduct a certain sum from the price of seven barrels, because what was delivered was not equal to the sample, the fact was not known, that the article was not fit to make printers' ink. As the defendant apprised the broker when he bought it, that he had no occasion to use it for two months, it was not for the plaintiff to complain that that length of time transpired before the defendant ascertained its unfitness when he attempted to use it. Moreover, if there was a warranty of this nature, he was under no obligation to examine and return the lamp-black within a reasonable time. He might do so if he thought proper, and by so doing discharge himself from the payment of the price; or he might keep the property, and have his remedy by an action for the breach of the warranty, or recoup his damages in an action brought for the price (*Stroud* v. *Pierce*, 6 Allen, 413; *Fielder* v. *Starkin*, 1 H. Bl. 17; *Buchanan* v. *Parnshow*, 2 T. R. 745; *Fisher* v. *Samuda*, 1 Camp. 190; *Dukes* v. *Nelson*, 27 Ga. 457; Hilliard on Sales, 374, 3d ed.). There was no waiver, therefore, of this warranty, by agreeing to abrogate the warranty that the bulk corresponded with the sample, as the defendant did not then know that there was or would be any

breach of the additional warranty that it was fit to make printers' ink. When he discovered such to be the fact, he promptly advised the plaintiff that his workman had reported to him that the lamp-black would not work into ink, owing to a mixture of something that was in it, and that it had done a great deal of mischief. He brought his workman to the plaintiff to explain it to him, and the defendant said if that was the case, he would not want anything. The defendant proposed that the plaintiff should send an expert to the defendant's factory to examine the lamp-black and the ink made from it, and that whatever was decided by the expert sent by the plaintiff he (the defendant) would abide by it. That if the expert decided that the defendant's statement was wrong, he would keep the lamp-black and pay for it; and if he decided that the statement he made was right, he would return it. The plaintiff accepted the proposition, a day was fixed by him when he was to send the expert, and the defendant's workman waited at the factory to give the explanation; but the plaintiff's expert never came; so that, if the lamp-black was not returned, it was not through any fault or unwillingness on the part of the defendant.

That it was not fit to make printers' ink was sufficiently established by the defendant's evidence. Indeed, there was no contradiction in the testimony upon that point. The manufacturing chemist employed in the defendant's factory testified that it could not be made into printers' ink, and *was worth nothing for that purpose.* That he had to use three times as much of it as of the lamp-black previously used, and then the ink was thin, had not the same body, and the color was bad. That, in grinding it, a great deal of grit was found in it, so that what was ordinarily done in four hours, took the whole day. Some of the ink made from it was sent to a printer who used a great deal of ink, and it proved to be so bad and did so much injury to the printer, that the defendant lost his custom; in addition to which, the defendant sustained considerable damage by the loss of labor and by the loss of the materials compounded with it. In fact, the evidence established that for the purpose for which the defendant bought it, it was to him of no

value whatever; and this being the evidence, the jury found a general verdict for the defendant.

Numerous exceptions were taken by the plaintiff to the admission and rejection of testimony and to certain parts of the judge's charge. I have gone over all of them, and do not find any error that would entitle the plaintiff to a new trial. The broker had power to sell, and as it was not shown that he was under any restriction, he might sell with a warranty as to the quality of the article, or as to its fitness for a particular use (*Andrews* v. *Kneeland*, 6 Cow. 354). The judgment should be affirmed.

Judgment affirmed.